BEN HOLLADAY, APPELLANT, *v.* A. W. PATTERSON, RESPONDENT.

PUBLIC POLICY.—A CONTRACT TO DONATE MONEY TO SECURE THE LOCATION OF A RAILROAD DEPOT IS VOID—H., being a Director and President of the Oregon and California Railroad Company, and the owner of a controlling interest in the stock of said company, agreed with P., that in consideration of a certain sum of money he would cause the line of said road to be located on a certain route, and a depot to be built at a certain place, instead of adopting another route then surveyed, which was shorter, and over which said road could be constructed at less expense: *Held*, that such a contract is contrary to public policy.

RAILROAD CORPORATION—PUBLIC INTEREST IN.—A railroad company is a *quasi* public corporation, and the public have an interest in the location of their lines of road and depots.

IDEM—WHAT AGREEMENTS WILL NOT BE ENFORCED. — An agreement which tends to lead persons, charged with the performance of trusts or duties for the benefit of others, to violate or betray them, will not be enforced.

APPEAL from Lane County.

The facts are stated in the opinion of the Court.

*Dolph, Bronaugh, Dolph & Simon,* for Appellant.

*Thompson & Fitch,* for Respondent.

By the Court, BURNETT, J.:

This action was brought upon the following agreement or subscription paper, signed by the respondent herein:

"In consideration that Ben Holladay will cause the line of the Oregon and California Railroad to be located across the Willamette River within three miles of Harrisburg, and constructed thereon on the west side of such river to some point within the corporate limits of Eugene City, and will

establish a depot within the corporate limits of said Eugene City; and, in consideration of one dollar to each of the undersigned, paid by Ben Holladay, the receipt whereof we severally hereby acknowledge, we, the undersigned, do severally hereby promise and agree to pay to the said Ben Holladay, within sixty days from the date that such railroad is completed to Eugene City, so that a locomotive can run over the same to said city, the several sums, in United States gold coin, which we have respectively set opposite our names hereto.

"A. W. Patterson.................$1000 (one thousand).

"EUGENE CITY, OREGON, April 17, 1871."

Said subscription paper was signed by a number of other persons, with different amounts set opposite their names. It appears from the complaint that at the time this contract was made, to wit, on the 17th day of April, 1871, the plaintiff was the owner and holder of a controlling interest in the capital stock of the Oregon and California Railroad Company, which company then was a corporation duly organized under the laws of the State of Oregon for the purpose of constructing and equipping a railroad from Portland, Oregon, southerly through the Willamette, Umpqua and Rogue River Valleys to the southern boundary-line of the State of Oregon, and said company was then engaged in the construction of such railroad, which was at said date completed to a point some twelve miles north of the corporate limits of Harrisburg in Linn County, and that the plaintiff was at that date also one of the directors of said company, and the president of the board of directors thereof, and as such president, director and stockholder had the power to cause said railroad to be located and constructed on such line or route, as he, the plaintiff, might desire or determine, and was duly authorized to control such location by a resolution of said board of directors before that time duly adopted. That from said point twelve miles north of Harrisburg, southerly, two or more routes had been surveyed over which said railroad could be con-

structed—the one running some miles distant from Harrisburg and to the east thereof, and some three miles east of Eugene City and across the Willamette River at or near Springfield; the other running through the corporate limits of Harrisburg, and crossing the Willamette River to the west side thereof, at a point not further than three miles south of Harrisburg, and also running through the corporate limits of said Eugene City—the route running to the east of Harrisburg, and crossing the Willamette River at Springfield, being the shortest, and the one over which said road could be constructed at the least expense. That to induce the plaintiff Ben Holladay to cause said railroad to be located and constructed on the Eugene City route, and to locate a depot within the corporate limits of said Eugene City, the defendant made the agreement upon which this action is brought.

It is further alleged that the plaintiff caused said road to be located on the route last mentioned to Eugene City, and caused a depot to be established within the corporate limits of said Eugene City, according to said contract, and a claim for judgment for amount subscribed by defendant.

To this complaint there was a general demurrer interposed in the court below, which was sustained, and the case comes before this Court upon the points raised by the demurrer. The principal question presented is as to whether or not the contract sued on in this case is illegal. It is not disputed but that contracts against public policy are illegal and void, but the appellant insists that the contract in question is not of that character.

"Public policy" is a vague expression, and few cases can arise in which its application may not be disputed. Mr. Story, in his work on Contracts (§ 546), says: "It has never been defined by the courts, but has been left loose and free of definition, in the same manner as fraud. This rule, however, may be safely laid down, that wherever any contract conflicts with the morals of the times, and contravenes any established interest of society, it is void as being against public policy."

In illustration of this rule, he says (§ 576): "Where,

therefore, a person occupying a public office agrees for a reward to exercise his official influence in questions affecting both public and private rights, so as to bring about the private advantage of persons interested, the contract would be void. For every public officer is bound to be disinterested in the consideration of all public questions, and any contract which interferes with the free and unbiased exercise of his judgment in relation to a question of trust and confidence reposed in him is against public policy and good morals."

Railroad companies are defined to be *quasi* public corporations, and the directors act in a double capacity, to wit, as the agents for the company, and also as trustees for the public, clothed with an important public trust. 1 Redfield on Railways, 577, § 140, says: "The general duty of railway directors is an important and a public trust, and whether undertaken for a compensation or gratuitously, imposes a duty of faithfulness, diligence and truthfulness in discharge of its functions in proportion to its difficulty and responsibility."

It is, among other things, urged that this contract is not against public policy, because contrary to public interest, as the deflection of the line of the road from the more direct route of the original survey would best subserve the public interest, and promote the welfare of the community through which the road passes. The question of the validity of the contract does not, however, depend upon the circumstance whether it can be shown that the public has, in fact, suffered any detriment, but whether the contract is, in its nature, such as might have been injurious to the public.

Upon this point the case of *Fuller* v. *Dame* (18 Pick. 472) is pertinent. In that case it appeared that Fuller was a stockholder in the Boston and Worcester Railroad Corporation, and for a consideration, he agreed to use his influence in procuring that corporation to locate its depot at a particular place in Boston, it being expressed in the agreement that Fuller was of the opinion that the road ought, from a view to the public good, and the good of the

stockholders, to locate its depot at that place. The contract was held to be void, on the ground that the road was established for the public accommodation, although a private corporation, and that the public had an interest in the question of the location of the depot; and that, though the contract was not made to induce a party to do an unlawful act, it put him under an influence to do that which might injuriously affect the interests of the public. The court says: "Nor is it any satisfactory answer to say that when the agreement was entered into he had come to the opinion that the location in question was the best for the interests of the public and for the interests of the corporation. That opinion might be changed by new views and new offers, and besides, the terms upon which this boon was to be obtained was still an open question. But, upon all these questions, the influence of the promise of separate and distinct advantage deprived him of the power of exercising a free, disinterested and unbiased judgment."

It is claimed, by appellant, that the contract under consideration should be viewed as though made by the respondent directly with the railroad company, and we will examine the question in that light.

The directors of the company were clothed by law with the power of locating their line of road and depots. What is the nature of that trust? As has been heretofore remarked, they were acting for the company, but they were also acting for the public, and if the public have an interest in the route selected for a railroad, being the nearest and best, and the depots located so as to best answer the convenience of the traveling public, would the contract entered into by the appellant, Ben Holladay, with the respondent, by which they were to receive money to adopt the route by Eugene City, instead of the route by Springfield, which was a shorter route, and over which the road could be built at less expense, have a tendency to make them disregard either the interests of the company or of the public? If so, it cannot be enforced, for "an agreement which is designed, or which in its nature and effect tends to lead persons who are charged with the performance of trusts or duties for the

.benefit of others, to violate or betray them, is contrary to public policy." That the public have an interest in the location of the line of all railroads, as well as their depots, I think cannot be disputed.

The Supreme Court of the State of Illinois, in the case of *John L. Marsh* v. *The Fairbank, Pontiac and Northwestern Railway Company*, in discussing this question, uses the following language: "Railroad companies are incorporated by authority of law, not for the promotion of mere private ends, but in view of the public good they subserve. It is the circumstance of public use which justifies the exercise, on their behalf, of the right of eminent domain in the taking of private property for the purpose of their construction." And in the case of *Walther* v. *Warner* (25 Mo. 281), it is said, "that the building of railroads by private corporations, under the authority of the Legislature, for the public accommodation, was a public use for which private property might be lawfully taken."

In the case of the *Pacific R. R. Co.* v. *Seely* (45 Mo. 212), the court, in speaking of railroads, uses the following language: "In all these enterprises there is a mingling of both public and private benefit, and the interests of the public are not to be sacrificed to mere private gain." (And see further, 3 Paige Ch. 45; 18 Wend. 1.)

It is urged by counsel for the appellant that there are adjudicated laws which sustain contracts similar to the one upon which this action is brought, and the case of *McClure* v. *The Gulf Railroad Company* (9 Kansas, 373), is cited and relied on for that position; but an examination of that authority will show that, while the decision was based mainly upon a statute peculiar to that State, the question that is presented here was not passed upon in that case. Plaintiff in error there claimed that the contract to induce the railroad company to adopt the Baxter Springs route instead of the Tar Creek route, the latter being the most direct route to Preston, Texas, the objective-point of said road, was against public policy; but the court laid out of view entirely that question, as will be seen by the language of the opinion, which is as follows: "It is said that the objective-point of

the road was, and is, Preston, in the State of Texas; that the running of the road to Baxter Springs was simply a choice of routes to Preston, Texas. But as Preston is beyond the boundaries of Kansas, and as no railroad company can be chartered in Kansas with power to build a railroad beyond its boundaries, the location of Preston, or the choice of routes to it, can have no bearing in this case." In the case of *Cumberland Valley Railroad Company* v. *Beale* (2 Am. R. R. Cases, 187), it is said "that the right to determine a question of location being a corporate one, is paramount even to public convenience." If it is meant by this statement that the directors of a railroad company, or a majority of them, can sell out the location of their line of road or depots, and adopt that location where the most money is offered, without regard to the interests of the public, such a view is not sustained by any other decision, nor do we believe it is correct. It was argued in the case last above cited, that unless the railroad company was allowed to enforce conditional donations made toward building a bridge, that the company might not have been able to build the bridge at all. Whatever force there might have been in such an argument in that case, it has none in this, for it appears that the railroad company was proceeding in the construction of their road when they were induced by the contract set out in the complaint to change their line from a more direct route and cross the Willamette River to the west side, and thence to Eugene City; but we conceive such reasoning to be entirely unsound. While it is right and proper for railroad companies to avail themselves of any voluntary aid from private individuals that they can obtain to assist in building their roads or bridges, it is not to be supposed that they rely on such uncertain aid. When a railroad company organizes for the purpose of entering upon the enterprise of building a railroad, their capital stock is fixed at an amount sufficient to cover the cost of building the road, and it is from the stock taken in good faith and honestly paid up that the means are mainly to be derived to build such road; and that is the source pointed out by law from which such funds are to be derived, which, in addition to the munificent

grants of land made to this company by Congress, ought certainly to enable them to build their road without speculating on the necessities or avarice of the communities through which they pass at the expense of 'the public interests.

There has been some considerable discussion in some of the authorities cited as to whether conditional subscriptions for stock could be upheld, and authorities are somewhat conflicting. In New York it has been held that conditional subscriptions of stock in turnpike and plank roads were invalid on the ground that to allow subscriptions to the stock of such a corporation to be received, conditioned that a particular location of the proposed road should be adopted, would be contrary to public policy, as by such means improper influences might be brought to bear upon the question of location. (15 N. Y. 585.) But whatever view might be taken of conditional subscriptions to stock, they stand on an entirely different footing from the case at bar.

It may be conceded that ordinarily the interests of the company, in locating their lines of road and depots, will be the interests of the public, and the location or choice of routes safely left with the directors; but this confidence, however, could only be safely so reposed under the belief that all the directors and members of the company would exercise their best and their unbiased judgment upon the question of such fitness without being influenced by distinct and extraneous circumstances. (*Fuller* v. *Dame*, 18 Pick. 472.)

If one neighborhood, town or individual may make valid conditional promises to pay large sums of money to a board of directors of a railroad company to so locate their road or depots as to enhance the value of the property of the promisors, every other town or individual may make like bids, and there is great danger of the public interests being lost sight of entirely in a mercenary conflict of local and private interests.

Judgment affirmed.

PRIM and MCARTHUR, JJ., concurred.

BONHAM, J., and UPTON, C. J., dissented.