Argued July 25, decided Sept. 26. rehearing denied Dec. 12, 1911.

### FORD *v.* OREGON ELECTRIC RY. CO.

[117 Pac. 809.]

DEEDS—PROPERTY CONVEYED.

1. The word "heirs" is not necessary in a deed to convey a fee-simple estate, since, by the direct provisions of Section 7103, L. O. L., all of the grantor's title passes unless intent to convey a less estate appears by the terms of the deed, or is necessarily implied therefrom.

COVENANTS—COVENANTS RUNNING WITH LAND.

2. A covenant in a right of way deed to an electric railway company, requiring it to stop all regular trains at a crossing on the grantor's farm, ran with the land, and could be enforced by the grantor's devisee.

CONTRACTS—PUBLIC POLICY—ESTABLISHMENT OF RAILROAD STATION.

3. An agreement in a right of way deed, requiring an electric railway company to stop all regular trains for passengers at a crossing on the grantor's farm, was void as against public policy; the validity of such a contract not depending upon whether the public has been actually injured thereby, but whether its enforcement might tend to injure the public.

SPECIFIC PERFORMANCE—ENFORCEMENT—DISCRETION OF COURT—CONTRACTS AGAINST PUBLIC POLICY.

4. Where the enforcement of a contract will inconvenience the public, equity will refuse to enforce it in the exercise of its discretionary power; the rule being frequently applied to contracts by a railroad company to stop its trains at certain places.

From Marion: WILLIAM GALLOWAY, Judge.

Statement by MR. JUSTICE BEAN.

This is a suit in equity by Frank Ford against the Oregon Electric Railway Company, a corporation. The

defendant, an electric railway corporation, appeals from a decree requiring it to stop its local trains for the accommodation of passengers at a road crossing near the house on the land of plaintiff, in performance of a contract executed August 25, 1906, by Tilmon Ford, accepted by defendant, and duly recorded, the material parts of which, omitting description of the land, is as follows:

"Know all men by these presents, that Tilmon Ford, unmarried, of the County of Marion in the State of Oregon, in consideration of the sum of six hundred dollars and other good and valuable considerations hereinafter expressed, to him paid by the Oregon Electric Railway Company, * * the receipt whereof is hereby acknowledged as to said money, and the other consideration hereinafter expressed, has granted, bargained, sold, and conveyed, * * a right of way for its railroad. * *"

Several covenants are then inserted in said deed as to fencing the right of way and building cattle guards and crossings, as to said grantee, its successors, and assigns, and then the following:

"Said grantee, its successors and assigns, in operating said railway shall stop its local trains for the purpose of taking on or putting off passengers at the road crossing easterly from where the house now stands on said premises, together with all and singular the tenements, hereditaments, or appurtenances thereunto belonging or in any wise appertaining, subject to the terms and conditions of said conveyance."

It appears that after the execution of the right of way deed, the defendant, the Oregon Electric Railway Company, constructed its railroad from Portland to Salem, over which it has been operating its trains since January 1, 1908. The farm of plaintiff, Frank Ford, contains 220 acres, upon which there is situated the farmhouse mentioned and other buildings, eight-tenths of a mile from Chemawa station on the south, and one and four-tenths miles from Quinaby station on the north. The crossing in question is situated near the center of the 220-acre tract and it is asserted by plaintiff that about 40 or 50

people would be better accommodated with a station at that location. It appears that the wagon road crossed by defendant's electric line is a private roadway; that the plaintiff desires to cut up and sell his land in 5-acre tracts, concerning which facts, in answer to the question, "In order to allow the public to use your crossing, you would have to give your permission to go across your land and lay out a road. If the train would stop, you would either have to let the people come across your place, or lay out a road?" the plaintiff replied, "Yes, sir." Plaintiff demanded of defendant that its trains be stopped according to its contract, and contends that he is entitled to have the contract specifically enforced as his only adequate remedy.

On behalf of defendant, it is asserted that there are about 25 people residing within one-half mile of the proposed station; that from 4 to 6 local trains stop at all of the stations on the road, making 30 stops; the schedule time for the run between Portland and Salem being two hours. Two other through or special trains make the run in an hour and 40 minutes, covering the distance between Chemawa and Quinaby stations in 4 minutes; that the passenger business handled in and out of Chemawa and Quinaby between June 8 and November 30, 1908, was for the former station, 1,912, an average of about 70 passengers per day, and for the latter 689, a daily average of 4 passengers. The total number of passengers for this period passing Chemawa and Quinaby both north and south, exclusive of those moving in and out of such stations, was 66,800, making the daily average of passengers passing these stations about 380; that the establishment and maintenance of another station in this vicinity would consume additional time, and delay the freight and passenger traffic on the line; that the income to be derived from such station would not equal the actual expense of stopping and starting the trains; and that such a require-

ment would work a hardship and injustice to defendant; that the consideration of $600 paid for the land for the right of way was the full value thereof. It is further contended on the part of defendant that the "necessities and convenience" of plaintiff, and all the inhabitants in the vicinity of his land, have since the operation of the railroad adequately been served by the stations of Chemawa and Quinaby; that at no time has there been enough passenger or freight business to warrant the establishment of any more stations on this part of the line. It appears that Tilmon Ford was for many years and up to the time of his death the owner in fee of the lands described in the deed, through which the right of way extends. He died March 1, 1908, and since his death by his devise the plaintiff, Frank Ford, has been the owner and in possession of the lands; that such lands are in a sparsely settled community; that the private roadway on the premises leads to a county road, which, in turn, leads to Chemawa and Quinaby stations; and that except by this private road the crossing referred to is inaccessible.

REVERSED.

For appellant there was a brief over the names of *Messrs. Carey & Kerr, Mr. Harrison Allen* and *Mr. John H. McNary,* with oral arguments by *Mr. Allen and Mr. McNary.*

For respondent there was a brief with oral arguments by *Mr. William M. Kaiser* and *Mr. Myron E. Pogue.*

MR. JUSTICE BEAN delivered the opinion of the court.

We deem it better to consider the facts alleged in the complaint, combined with the evidence in the case. It is argued upon the part of defendant that, as the land was devised to plaintiff by Tilmon Ford, the covenantee, the covenant is merely personal to Tilmon Ford; that the covenant extends to a thing not *in esse,* and does not run with the land, and for this reason the plaintiff can-

not maintain this suit, citing authorities based upon *Spencer's Case,* 5 Coke, 16a, 1 Smith, Lead. Cas. 174 (note 11 Cyc. 1080), from which we quote as follows:

"Spencer demised a house and lot to S. for years. S. covenanted for himself, his executors, and administrators that he, his executors, administrators, or assigns would build a brick wall on part of the land demised. S. assigned the term to J. and J. to Clark. Spencer sued Clark for a breach of the covenant to build the wall. The court by the first resolve held that a covenant only bound the assignee when it was concerning a thing *in esse,* parcel of the demise, not when it related to a wall to be built. By the second resolve, they held that, if the covenant had bound the 'assigns' by express words, it would have bound the assignee, although it was for a thing to be newly made, as it was to be upon the thing demised; but that if the covenant was for a thing to be done collateral to the land, and did not touch or concern the thing demised, in any sort, as if it were to build a house upon other lands of the lessor, the assignee should not be charged, although the covenant was for the covenantor and 'his assigns.' The two principles thus settled have always been acknowledged as law: That the assignee when not named is not bound by a covenant, except it relates to a thing *in esse* at the time, and that, when named, he is not bound by a covenant collateral to the land, but only for things to be done on or concerning the land."

In *Aikin* v. *Albany, V. & C. R. R. Co.,* 26 Barb. (N. Y.) 289, 293, it is said:

"A covenant which is beneficial to or binding on the owner as owner, and on or to no other person, runs with the land. * * (Citing 5 Barn. & Adol. 11; *Dolph* v. *White,* 2 N. Y. 302.) * * Yet it is also held that where the thing covenanted for, though not *in esse,* touches or concerns the thing demised, the covenant does run with the land. (Citing *Allen* v. *Culver,* 3 Denio [N. Y.] 285.)

"Covenants are to be regarded as affecting the land, though not directly to be performed upon it, provided they tend to increase or diminish its value in the hands of a holder."

11 Cyc. 1081, citing *Van Rensselaer* v. *Smith*, 27 Barb. (N. Y.) 104.

"In order that a covenant may run with the land— that is, that its benefit or obligation may pass with the ownership—it must respect the thing granted or demised, and the act covenanted to be done or omitted must concern the land or estate conveyed. Whether a covenant will or will not run with the land does not, however, so much depend on whether it is to be performed on the land itself, as on whether it tends directly or necessarily to enhance its value or render it more beneficial and convenient to those by whom it is owned or occupied, for, if this be the case, every successive assignee of the land will be entitled to enforce the covenant. A covenant which may run with the land can do so only when there is a subsisting privity of estate between the covenantor and the covenantee; that is, when the land itself, or some estate or interest therein, even though less than the entire title, to which the covenant may attach as its vehicle of conveyance is transferred. If there is no privity of estate between the contracting parties, the assignee will not be bound by, nor have the benefit of, any covenants between the contracting parties, although they may relate to the land he takes by assignment or purchase from one of the parties to the contract. In such a case the covenants are personal and collateral to the land. On the other hand, if there is a privity of estate, a covenant which may run with the land will pass as an incident to a subsequent conveyance. But if any estate passes, so as to create privity, it is sufficient to carry the covenants, and the decided weight of authority is to the effect that covenants run with incorporeal as well as corporeal hereditaments." 11 Cyc. 1080, 1083.

See, also, *Gilmer* v. *Mobile & M. Ry. Co.*, 79 Ala. 569, 572 (58 Am. Rep. 623) ; *Taylor* v. *Florida E. C. Ry. Co.*, 54 Fla. 635 (45 South. 574: 16 L. R. A. [N. S.] 307: 127 Am. St. Rep. 155).

It is said in *Duffy* v. *New York & H. R. R. Co.*, 2 Hilt. (N. Y.) 496, quoted from by Mr. Justice Moore in *Brown* v. *Southern Pacific Co.*, 36 Or. 128 (58 Pac. 1104: 47 L. R. A. 409: 78 Am. St. Rep. 761) :

"But this nice distinction, originating at a time when it was necessary to use the word 'heirs,' or other words of inheritance, in a conveyance, in order to grant or convey an estate in fee, cannot be now said to exist, as in *Norman* v. *Wells,* 17 Wend, (N. Y.) 136, it was determined that those covenants run with the land, which are made touching or concerning it, and affect its value, and are not confined to those which relate to some physical act or omission upon it."

1. As said by Mr. Justice MOORE in that case, the word "heirs" is not now necessary to create or convey an estate in fee simple. All of the grantor's estate passes by his deed unless the intent to convey a less estate appears by express terms, or is necessarily implied from the language of the deed. Section 7103, L. O. L. See also, *Ruhnke* v. *Aubert,* 58 Or. 6 (113 Pac. 38), in which Mr. Justice MCBRIDE, in construing the reservation in the deed of right of way for an irrigating ditch says:

"In determining whether a right granted is appurtenant or in gross, courts must consider the terms of the grant, the nature of the right, and the surrounding circumstances, giving effect, as far as possible, to the legally ascertained intention of the parties, but favoring always the construction of the grant as of an easement, appurtenant rather than of a right in gross. (Citing 10 Am. & Eng. Enc. Law (2 ed.) 405; Washburn, Ease. [4 ed.] 45; *Stovall* v. *Coggins Granite Co.,* 116 Ga. 376 (42 S. E. 723). And the rule that the rights of parties to a deed must be ascertained from its words is in cases of this kind subject to the modification that surrounding circumstances may be taken into consideration in order to ascertain the intention of the parties. (Citing Jones, Ease., § 38; Jones, Real Prop., § 344.)"

The covenant in question is in the nature of a reservation, providing for a means of travel to and from the land mentioned and over the right of way granted to the railroad company. Tested by the rules laid down in the foregoing authorities, and many others to the same effect

which might be cited, it is clear that, if by the covenant the right for a footpath or bridlepath had been reserved for the use of the owner or people occupying this farm along the right of way mentioned, there would be no question but that such a covenant would run with the land. The covenant is for the benefit of the owner, as owner, or occupant of the farm only, and apparently for the benefit of no other person. It has been held that the covenant to furnish gas for lighting and fuel to be used in buildings upon certain lands would run with the land: *Ind. Nat. Gas Co.* v. *Hinton,* 159 Ind. 398 (64 N. E. 224). See, also, a covenant to furnish water to be used upon land. *Stanislous W. Co.* v. *Bachman,* 152 Cal. 716 (93 Pac. 858: 15 L. R. A. [N. S.] 357) ; *Ruhnke* v. *Aubert,* 58 Or. 6 (113 Pac. 38) ; *Tone* v. *Tillamook City,* 58 Or. 382 (114 Pac. 938).

2. We see no reason why a covenant to furnish electricity for lighting or telephone service or car service for the benefit and convenience of the owner and those residing upon certain farms, to which there is no other valid objection, should not, upon the same principle, be for the benefit of the devisees or assigns of the covenantee.

3. It is further contended, however, that the provision of the deed in question is void as against public policy. It was said in the case of *Burney's Heirs* v. *Ludeling,* 47 La. Ann. 73, 96 (16 South. 507, 516) :

"The railroad corporation was a *quasi* public agent, and it was its duty, independent of any agreement to secure advantage to it, to establish its stations at points most convenient for the public interests. An agreement, therefore, by the corporations for a part of the land to establish its depots or stations at particular points, is illegal."

In *Holladay* v. *Patterson,* 5 Or. 177, in which Holladay, being a director and president of the O. & C. Railroad Company, and the owner of the controlling interest in

the stock thereof, agreed with Patterson that, in consideration of the payment to him of a certain sum of money, he would cause the line of road to be located on a certain route, and a depot to be built at a certain place, it is stated:

"Railroad companies are defined to be *puasi* public corporations, and the directors act in a double capacity, to wit, as the agents for the company, and also as trustees for the public, clothed with an important public trust. 1 Redfield, Railways, 577, § 140, says: 'The general duty of railway directors is an important and a public trust, and, whether undertaken for a compensation or gratuitously imposes a duty of faithfulness, diligence, and truthfulness in discharge of its functions in proportion to its difficulty and responsibility.' It is, among other things, urged that this contract is not against public policy, because contrary to public interest, as the deflection of the line of the road from the more direct route of the original survey would best subserve the public interest, and promote the welfare of the community through which the road passes. The question of the validity of the contract does not, however, depend upon the circumstances whether it can be shown that the public has, in fact, suffered any detriment, but whether the contract is, in its nature, such as might have been injurious to the public."

The court held that this contract was void on the ground of public policy, and in the case of *Oregon & C. R. R. Co.* v. *Potter*, 5 Or. 228, a similar case, the court followed the former decision, holding the contract to be invalid. In *Florida Cent.* v. *State*, 31 Fla. 482 (13 South. 103: 20 L. R. A. 419, 423: 34 Am. St. Rep. 30), where the defendant town of Tavares filed a petition for mandamus to enforce a contract made by one Abrams, who gave the railway a right of way in the town and also a block of land, known as "Shore Park", in consideration that the railway company would cause to be constructed on the block a passenger depot, "and that all

passenger trains of said railway company should stop at such passenger depot", a case in which the contract was made direct with the railway company, the court ruled:

"The case made, however, by the alternative writ before us does not seek merely to compel the erection of a depot building on the line of the respondent's road at some point at or near the town of Tavares that will be reasonably subservient to the wants and convenience of the inhabitants and business of that community, leaving the exact spot of its location there to the discretion necessarily vested in the company in such matters; but the sole demand of the writ is that the respondent company shall be compelled to erect a depot building on the particular spot in said town known as 'Shore Park'. * * It seems to be universally well settled that contracts undertaking to obligate a railroad company to establish its depot exclusively at a particular point are void as against public policy."

There are several cases in which contracts similar to the one in question have been sustained in different states, where the statutes therein have either impliedly or otherwise sanctioned such aid being given to the railroad corporation. Among these are the *Missouri Pac. Ry. Co.* v. *Tygard,* 84 Mo. 263, 270 (54 Am. Rep. 97); *Cumberland V. Ry.* v. *Baab,* 9 Watts (Pa.) 458 (36 Am. Dec. 132); *Kansas Pac. Ry.* v. *Hopkins,* 18 Kan. 494. The case of *Cedar Rapids & St. P.* v. *Spafford,* 41 Iowa, 292, is based upon similar grounds. The decisions upon this subject are based upon the ground that it ought to be left to the discretion of the directors or officers of a railroad corporation to locate or relocate stations and stop trains where the interest of the public, and public necessity may be best subserved.

A railroad company, being a public service corporation, owes its first and highest duty to the public, and any agreement having a tendency to interfere, or which may interfere, with that duty, is against public policy, and should not be enforced in a suit in equity.

It is claimed upon the part of plaintiff that the case at bar differs from that of *Holladay* v. *Patterson,* 5 Or. 177, in that a compliance with the provision of the covenant in question would prohibit the stopping of trains at any other point. This is a matter, we think, in which the difference is in degree only. As was said in the last-named case, the question does not depend upon whether it can be shown that the public has in fact suffered any detriment, but whether the contract is in its nature such as might have been injurious to the public. Should a station be established or trains stopped upon the private property of the plaintiff, with no public roads or other means of access to such point, it certainly would interfere to a certain extent with the stopping of trains at other places and the service to the public. Authorities upon this question are not uniform. In the case of *Louisville, N. A. & C. R. R.* v. *Sumner,* 106 Ind. 55, 62 (5 N. E. 404: 55 Am. Rep. 719), such cases are classed as follows: (1) Those containing stipulations, providing for the erection of stations or depots at particular places, and prohibiting them at other. (2) Those in which some officer of the company, for a consideration moving to him, undertakes to secure the location of stations and lines of railway, etc. (3) Those in which the agreement has been made between an individual and a railway corporation for the location of a station or depot at a particular place in consideration of a donation of money or property to the corporation, without any restriction or prohibition against any other location. It is claimed that the case at bar comes within the latter class, and the provision in the deed is not objectionable; that the consideration moving to the company differs from a consideration moving to some officer of the company. In principle, however, we are unable to see any difference in so far as the public is concerned. The company is represented by its

officers, and it matters little whether the consideration is paid to one officer or to all of the officers or to the company. The injury to the public would be just the same if its interests are interfered with. The rule announced in the Holladay Case is a salutary one, and under present day conditions the principle there enunciated should be adhered to.

The principal reason for plaintiff's wishing a station at the place referred to, according to his testimony, is that he desires to subdivide and sell his land in five-acre tracts. When this is done, the conditions may be so changed and the number of people to be accommodated so increased that there will then be a greater public necessity for the station. This, however, is a matter of speculation, that can be determined only in the future. It appears that it is half a mile from the crossing of this private road to a county or other public road, and while plaintiff indicates, and no doubt in good faith, that he intends to lay out a road or let people cross his land, the conditions may change, and there is no certainty of any permanent means of ingress to or egress· from the proposed station.

4. Cases involving contracts of this character, the questions of convenience and inconvenience to the public are considered, concerning which the rule is stated in 6 Pomeroy's Equity Jurisprudence, §§ 795, 796, as follows:

"Where the consequence of enforcement of the contract is to inconvenience the public, the discretionary power of equity is exercised to refuse its aid. This rule is frequently applied in contracts by which a railway has bound itself to do some act, as to build a private grade crossing, or stop its trains at complainant's place. If the public service would be endangered or inconvenienced, with no corresponding benefit to complainant, he cannot have performance. But not every slight inconvenience to the public will be a reason for refusing performance.
    Sig. 10

Specific performance not being an absolute right, the fact that enforcement would be of little or no benefit to the complainant, and a burden upon the defendant, is sufficient to constitute performance oppressive, and it will not be given. The disproportion between the burden upon the defendant and the gain to the plaintiff makes performance inequitable. Instances are found on the cases of restrictive covenants on land, where, the character of the neighborhood having changed, as, from a residence to a business neighborhood, the whole purpose of the covenant is gone, and enforcement would be of no benefit to complainant."

The matter of establishing and maintaining the station in controversy is a *quasi* public question; that is, the general public as well as the parties to this suit is interested therein. No depot building is required to be constructed at this point, and we think the question of stopping the trains thereat is in part at least one of public service by the railroad corporation, the regulation of which is a duty imposed, in the first instance, upon the Railroad Commission of the State, under the provisions of Chapter 53, Laws 1907, p. 67, known as the "Railroad Commission Act." Section 6875, *et seq.*, L. O. L.

Section 6887, L. O. L., provides:

"Every such railroad is hereby required to furnish reasonably adequate service, equipment and facilities. * *"

Section 6906, L. O. L., provides that, upon complaint of any person, firm, corporation, or association the service in connection with any railroad is inadequate, the commission may notify the railroad company thereof and proceed to investigate the same, and shall have power to make such orders respecting such regulations, practice, or service found to be inadequate as it shall have determined to be reasonable, which shall be followed in the future, and since the passage of this act the Railroad Commission has been engaged in the performance of its duties thereunder, has considered and acted upon ques-

tions relating to the service, the location of stations and the stopping of trains, etc.  See Annual Report of Railroad Commission 1909, pp. 32, 39, 54, 89.  Its power to adjust these matters was decided in the case of the *Portland Ry. Light & Power Co.* v. *Railroad Commissioners of Oregon,* 56 Or. 468 (105 Pac. 709).  While the law provides for a review of acts of the commission, there is not now the necessity for the interposition of a court of equity in the first instance in matters of this nature that formerly existed, rendering less applicable as precedents the cases decided prior to the enactment of this law. Under the present regime, if a court of equity should take cognizance in the first instance, regardless of the general plan and supervision of the Railroad Commission, it would doubtless tend to a confusion of results, to the detriment of the public's interest, and with but little, if any, benefit to the private parties concerned.  Under the law the orders of the commission may be rescinded or amended from time to time, according to change of conditions or requirements of necessity (Section 6908, L. O. L.), while the decree appealed from is in form perpetual.

There is practically no public necessity for the station as prayed for on the line of defendant's railroad, and under all the facts and circumstances in the case we think the contract should not be enforced in a suit in equity. *Louisville, N. A. & C. R. R.* v. *Sumner,* 106 Ind. 55, 62 (5 N. E. 404: 55 Am. Rep. 719) ; *Texas & St. R. R.* v. *Robards,* 60 Tex. 545 (48 Am. Rep. 268) ; *Cincinnati & C. Co.* v. *Washburn,* 25 Ind. 259.

The decree of the lower court will therefore be reversed, and the suit dismissed.    REVERSED.