Argued 31 July, decided 23 October, 1906.

**MORTON v. OREGON SHORT LINE RY. CO.**

87 Pac. 151, 1046; 7 L. R. A. (N. S.) 344.

WATER COURSES—RESTORATION OF CHANNEL.

1. Where a freshet causes a natural stream to form a new channel across the land of a riparian proprietor, the latter may, within a reasonable time, restore the flow to its original bed.

RIPARIAN OWNER—RIGHT OF LICENSEE.

2. The rights of a licensee of a riparian proprietor as to the stream are the same as those of the licensor, but not greater.

STREAM AND SURFACE WATER—FLOODS.

3. Water flowing in a swollen stream is not surface water which may be considered a common enemy, and one undertaking to protect his own land from such water must not injure the property of others.

WATER COURSE—RIGHT TO BUILD JETTY—RIPARIAN DAMAGE.

4. A jetty built to restrain and control the flow of a stream for the protection of the riparian property of the builder, but which causes the water to injure another bank owner, is an unlawful obstruction, the maintenance of which may be enjoined.

JUDICIAL NOTICE—LAWS OF NATURE.

5. Courts will take judicial notice of the effect of the waters of a stream during a flood turned nearly at right angles against the land of a riparian proprietor, such effect being dependent on the laws of nature.

COSTS IN EQUITY ARE DISCRETIONARY.

6. The apportionment of costs and disbursements in equity is entirely discretionary with the court, under Section 566, B. & C. Comp.

RIGHT TO MODIFY DECREE ABATING OBSTRUCTION TO STREAM.

7. Where a riparian proprietor has constructed a jetty into a stream, the effect of which is to cause the water to flow almost at·right angles against plaintiff's land, injuring it, and the court has decided that the jetty is an unlawful obstruction, which plaintiff is entitled to have abated, the order may be modified on a showing that the demolition of the entire jetty is unnecessary, and that a retention of a part of it will not injure the plaintiff's premises, but will afford protection to the defendant.

From Malheur: GEORGE E. DAVIS, Judge.

Statement by MR. JUSTICE MOORE.

This is a suit by J. A. Morton against the Oregon Short Line Railway Co., a corporation, to enjoin the maintenance of obstructions to the flow of water in a stream. The complaint states, in substance, that the plaintiff is the owner of certain

real property in section 28, township 18 S., of range 47 E., in Malheur County, which land lies west of and borders on the Snake River; that in 1904, the defendant built above such premises in the west channel of the stream certain dams which deflected the water, depositing sediment in the channel, and shoaling it so as to prevent the operation of plaintiff's private ferry boat from his land to an island in the river, and also depriving his arid land of water from the river for subirrigation; that these obstructions caused another channel to form in such a direction as to force a current directly against the bank of his land, cutting away a wide margin thereof, and, if such encroachment is permitted to continue, it will force a channel through a depression in his premises, making an island of a part thereof to his irreparable injury, to redress which he has no plain, speedy or adequate remedy at law. The answer denied the material allegations of the complaint, and averred, in effect, that in 1883 the defendant built its railroad through Malheur County on the right of way now occupied thereby and thereafter maintained its roadbed and track, operating trains thereon for the benefit of the public; that at the time the railroad was constructed the water of Snake River, during each freshet, flowed through a swale situated between the roadbed and the west channel of the river, and the floods in that stream have cut and are cutting away the bank near the track, thereby endangering the roadbed to such an extent that the defendant was compelled to build the obstructions complained of, to prevent its property from being destroyed; and that the swale is the so-called channel referred to in the complaint as the west channel of the river, but that such swale is, and at the time the railroad was constructed was, at least 300 feet west of the west channel of Snake River. The reply having put in issue the allegations of new matter in the answer, the cause was referred, and from the testimony taken the court made certain findings and dismissed the suit, from which decree the plaintiff appeals.  REVERSED.

For appellant there was a brief over the names of *William Rufus King* and *W. H. Brooke,* with an oral argument by *Mr. King.*

For respondent there was a brief over the names of *P. L. Williams, Frank Sigel Dietrich* and *A. N. Soliss,* with an oral argument by *Mr. Dietrich.*

MR. JUSTICE MOORE delivered the opinion of the court.

The transcript shows that the plaintiff is the owner of the real property mentioned, and that his land borders on the west bank of the Snake River. The township referred to was surveyed in 1874, and the field notes thereof, a copy of which was offered in evidence, show that the left bank of the river, as meandered, then intersected the south boundary of section 33 at a point 68.35 chains west of the southwest corner of that section, and extended northwesterly by a curved line to a point west, but near the center, of section 33; thence, by a similar line northeasterly, to a point east of the northeast corner of that section; thence westerly and northerly by a curved line to a point west of, but near the center of, section 28; and thence northeasterly to a point 2.80 chains east of the northeast corner of the latter section. A sketch of the margin of the river as indicated will disclose that when the government survey was made, the stream flowed around a peninsula over which the boundary between sections 28 and 33 extended. The defendant, in 1883, constructed its railroad from Huntington, Oregon, southerly through the premises hereinbefore described, and also through adjoining land on the south, now owned by H. M. Plummer. The defendant offered in evidence a blue print of the *locus in quo,* reduced to a scale of 400 feet to the inch, which indicates the original course of the river as meandered, the line of the railway as constructed, and other data. It appears from this plat that the railroad was built about 14 rods west of the meander line at the bend near the center of section 28, and about 52 rods west thereof at the curve near the middle of section 33. An extraordinary freshet in Snake River in 1894 cut across the base of the peninsula a new channel, which extends northeasterly over what theretofore had been a meadow. Prior to such change, a large part of the river below the peninsula flowed in a channel that separated plaintiff's land from Datey Island, east of his

premises; but, after such flood, the greater volume of water flowed east of that island. Immediately north of section 33, but south of Datey Island, the change in the channel of Snake River formed a large sand bar, constituting an island, the surface of which was above the ordinary stage of water. The bar is separated from the left bank of the river by a narrow channel which extends northerly, and is also severed from Datey Island by a broader channel that extends northwesterly; the waters of which unite and flow by plaintiff's premises.

The freshet adverted to and the annual floods in the river have washed away the left bank of the stream in sections 28 and 33, nearly to the east line of the right of way of the railroad, and, to prevent further injury therefrom, the defendant placed several hundred car loads of rock along the margin of the river; and in 1903, with Plummer's consent, it built, where the swale had been, five jetties that extend from the bank down stream at an acute angle with the thread thereof. These obstructions were made by driving parallel rows of piling about 12 feet apart, and filling the intervening space with brush and rock. The lower jetty is about 215 feet long, and extends nearly across the channel west of the sand bar at the head thereof. The other jetties are from 50 to 75 feet in length. Another extraordinary freshet in 1904 caused the bank of plaintiff's land, for a distance of about half a mile, to be washed away to the depth of 100 feet or more, whereupon he instituted this suit, and, at the trial, offered testimony tending to show that the lower jetty · prevented the water from flowing in the channel west of the sand bar, thereby permitting the current in the channel between the bar and Datey Island to flow nearly at right angles against his bank, damaging it; that the closing of the channel west of the sand bar caused sediment to be deposited, shoaling the channel east of his land, and preventing him from operating, by force of the current, a ferry boat which he maintained for his own use from his premises to Datey Island, a part of which he held by lease from year to year, and another part thereof was claimed by his son as a homestead where cattle were pastured in which he had an interest; and that if the lower

jetty be maintained the diminution of water in the channel will prevent the subirrigation of his land, which is arid, and will also prevent the water in the channel north of the sand bar to cut into a swale on his premises, thereby forming a new course through his land and creating an island.

The testimony relating to the injury which it is claimed will result to plaintiff's land by the maintenance of the lower jetty, though given by persons living in the vicinity of his premises, who are acquainted therewith, know the character of the soil, and the effect thereon of freshets in the river, consists of the opinions of several witnesses, and it is possible that the disastrous consequences which they predict may not eventuate. It was stipulated that three civil engineers who were employed by the defendant would, if present, testify that in the early spring of 1905, they made accurate measurements of the left bank of the river through the plaintiff's premises, setting stakes along the margin of the stream, and that returning to his land in the latter part of July, after the annual freshet had subsided, they found that no part of the bank had been washed away during that season, but that the water in the river in 1905 was not as high as it was the preceding year. The foregoing is deemed a fair statement of the material facts involved, and, based thereon, the question to be determined is whether or not the jetties can legally be maintained where they are built. The defendant's counsel insist that the river having suddenly changed its channel in 1904, thereby endangering the railroad track, their client, to protect its property, was authorized to restore the flow of the stream to its original bed, and hence the decree should be affirmed.

1. It has been held that the person across whose land a freshet in a natural stream suddenly causes a new channel to be formed may, within a reasonable time, restore the flow of water to its original bed: Farnham, Waters, § 491; *Mathewson* v. *Hoffman,* 77 Mich. 420 (43 N. W. 879, 6 L. R. A. 349).

2. It will be remembered that the defendant built the jetties into the river from the bank of Plummer's land with his consent, and, as he is a riparian proprietor on the new channel, the

railway company, as his licensee, secured such right to change the flow of the current as he possessed: *Slater* v. *Fox*, 5 Hun, 544.

3. An examination of the blue print referred to shows that the upper jetty is built nearly half a mile below the original meander line of the river where it commenced to cut the new channel, and as the barriers complained of do not force the water around the peninsula, they were evidently constructed to prevent injury to the railroad grade by deflecting the current. Instead, therefore, of attempting to restore the stream to its ancient channel, the defendant, by building the jetties, has in fact recognized the new way as the true water course, and tried to confine it to the bed as at first made. The swollen current of Snake River during floods is nevertheless a part of that stream at the place where the jetties are built, and not surface water, within the accepted meaning of that term, against which a land proprietor may combat as he would oppose a common enemy, though he thereby injures the real property of others: *Price* v. *Oregon Railroad Co.* 47 Or. 350 (83 Pac. 843).

The defendant's counsel, in support of the decree rendered, cite the case of *Gulf, etc. Railway Co.* v. *Clark,* 101 Fed. 678 (41 C. C. A. 597), upon the authority of which the trial court evidently relied. In that case a railroad company, to protect its roadbed, a part of which had been washed away by the gradual change of the channel of a river, built dikes some distance from the bank of the stream on what was formerly solid ground, to restore the current to its original channel. These dikes encroached upon the channel as it existed when they were built, and deflecting the current a subsequent freshet in the river washed away part of the land of a riparian proprietor, who, in an action to recover the damages sustained, secured a judgment, in reversing which the circuit court of appeals says: "A riparian owner may construct necessary embankments, dikes or other structures to maintain his bank of the stream in its original condition, or to restore it to that condition, and to bring the stream back to its natural course; and, if it does no more, other riparian owners upon the opposite or upon the same side of the

stream can recover no damages for the injury his action causes them." In that case, as the means adopted to prevent the road-bed from injury from encroachments of the channel consisted of dikes, the term "other structures" referred to in the opinion quoted, evidently means similar formations, and not jetties placed in a stream to deflect its course. The conclusion reached in the case adverted to is at variance with the rule announced in *Garrish* v. *Clough,* 48 N. H. 9 (97 Am. Dec. 561, 2 Am. Rep. 165), where it was held that though a riparian proprietor was authorized to protect the bank of his land from injury from the encroachment of a natural stream, he could not, without incurring liability, erect any structure for that purpose which would injure the property of others. These cases illustrate the conflict that exists in respect to this important subject. Which rule is founded on the better reason, or supported by the greater weight of judicial utterance, is not necessary to a decision herein.

The words "embankment" and "dike," when used to repre-sent the means employed to prevent the inundation of land, are synonymous, and mean a structure of earth or other material usually placed upon the bank of a stream or near the shore of a lake, bay, etc., the ends of which extend across low land to higher ground, forming a continuous bulwark or obstruction to water, and designed to keep it without the inclosure thus formed. A "dam," however, is a structure, composed of wood, earth or other material, erected in and usually extending across the entire channel at right angles to the thread of the stream, and intended to retard the flow of water by the barrier or to retain it within the obstruction. A "jetty" is a kind of a dam, usually built in the manner hereinbefore described, and intended to deflect the current so as to deepen the channel or to form an eddy below the obstruction in which sediment may be deposited, thereby extending and protecting the bank.

4. Assuming, without deciding, that an embankment may be built by a riparian proprietor to prevent his land from being submerged in extraordinary freshets, we think a jetty cannot be classed as "other structures," specified in the case relied upon, and that when they, by deflecting the current or by shoal-

ing the water, injure a lower riparian proprietor, the author of the obstructions violates the maxim, *"sic utere tuo, ut alienum non laedas."* One of the issues to be tried is the identity of the water course west of the sand bar at the head of which the long jetty is built. "The channel," says a distinguished text-writer, "is the passageway between the banks through which the water of the stream flows:" Farnham, Waters, § 417. This definition was undoubtedly intended to apply only to the entire uninterrupted space occupied by water flowing between well defined banks. The description of a channel, as given by the learned author, is broad enough, however, to include the flow of water between an island and a bank of a stream, and hence the exact meaning of the word embraces the passageway that was obstructed by the defendant's lower jetty. As the blue print shows this to be a water course which is indicated by the explanatory words "Very swift and shallow," and shows the passageway to be the most westerly route, we have no doubt that it is, as alleged in the complaint, the west channel of the Snake River.

5. It appears from the transcript that the lower jetty was intended to close this entire channel, but that the water, deflected by the angle of the barrier, washed the sand from the outer end of the obstruction, permitting a part of the current to continue in the bed of the stream west of the sand bar, but causing the greater volume to flow east thereof. As a jetty is a species of dam, and the lower obstruction deprives a riparian proprietor of the accustomed flow of water in the channel of the stream, is the deprivation of the right which is incident to the estate, such an injury as will authorize the granting of the relief sought? The plaintiff and his witnesses express the opinion that if the water is permitted to flow in the west channel, it will continue its course along the bank of his land and diverge the current, which otherwise strikes his premises at nearly right angles. This consensus of opinion is not based on observations as to the effect of the water at the line of injury to plaintiff's land during the flood of 1904, but the consequences assumed, though speculative, seem so reasonable and dependent upon the

laws of nature, of which a court will take judicial notice, that we are forced to the determination that injury must necessarily result to plaintiff's premises, and to his property rights incident thereto, if another freshet should occur in the river. The conclusion thus reached makes such a case as entitles the plaintiff to equitable intervention, but, as the lower jetty is the only one of which he seriously complains, that obstruction only will be ordered abated.

6. The defendant's objections to the plaintiff's right to institute this suit and to prosecute this appeal not being deemed important, the decree is reversed, and one will be entered here requiring the defendant, within three months from the entry of a mandate herein in the lower court, to remove the long or lower jetty; the plaintiff to recover his costs and disbursements in both courts.                                      REVERSED.

Decided 18 December, 1906.

ON MOTION TO MODIFY DECREE.

MR. JUSTICE MOORE delivered the opinion of the court.

7. After the opinion was announced in this case the defendant's counsel moved to modify the decree rendered in this court so as not to require the entire demolition of the long jetty, insisting that the retention of a part thereof will not injure the plaintiff's premises, and will afford some protection to the railroad embankment from erosion from the water. It is impossible to determine from the evidence before us whether or not the motion interposed should be allowed, and, this being so, the cause, upon the payment by the defendant of the costs and disbursements taxed, will be remanded, with directions to take testimony upon this question, and, if it shall appear therefrom to the trial court that any part of the long jetty can be allowed to remain without injury to the plaintiff's premises, to enter a supplemental decree to that effect, but if this cannot be done, to deny the motion.                                      REVERSED.