Argued May 11; affirmed July 6, 1938

## MESSINGER *v.* WOODCOCK

(80 P. (2d) 895)

In Banc.

*V. A. C. Ahlf*, of Grants Pass (James T. Chinnock, of Grants Pass, on the brief), for appellant.

*W. W. Balderre*, of Grants Pass (O. S. Blanchard, of Grants Pass, on the brief), for respondent.

BAILEY, J. This suit was instituted by the plaintiff, Mary Messinger, against the defendant, Ernest Woodcock, on April 28, 1936, for a decree declaring that the plaintiff was entitled to the use of all the water "arising from Messinger springs and flowing in Mes-

singer creek, down to and'' upon the farm land owned by the plaintiff, and that the defendant be forever restrained from interfering in any manner whatever with the free flow of the said water. Later, May 9, 1936, an amended complaint was filed, in which the same relief was asked.

The defendant in his answer prayed that the plaintiff be restrained and enjoined from using the water of the spring mentioned by the plaintiff, although not designated in the answer by the name given it in the complaint, and further be restrained from interfering with the defendant's use of such water, also that the plaintiff be decreed to have no right to the use of the said water, and for other relief. From a decree in favor of the defendant, granting the relief asked by him except as to recovery of damages against the plaintiff, the latter prosecutes this appeal.

The facts are substantially these: At the time of the trial and for several years prior thereto there was a spring in the northwest corner of the southeast quarter of the southwest quarter of section 12, township 38 south, range 7 west, W. M. This tract of land, together with the north half of the southwest quarter of section 12, was on June 4, 1935, and for some time prior thereto had been, owned by Josephine county. On that date the defendant ''applied to the county court of Josephine county, Oregon, for a deed to the land in and around said spring, the right to develop said spring and to use the waters thereof and to convey the said waters of the spring'' to the ''premises of the defendant, and for such rights of way as might be necessary for the above purposes, including right of way for defendant's pipe line and ditch.'' On that date a resolution was passed by the county court, granting to the defendant his request;

and on the same day Josephine county made, executed and delivered to the defendant a deed to "the spring and the waters therefrom rising in the northwest (NW) corner of the southeast quarter (SE¼) of the southwest quarter (SW ¼) of section 12, township 38 south, range 7 west of the Williamette meridian, and the right to pipe the water from said spring to Lots One (1), Two (2), and Three (3) in section 14, township 38 south, range 7 west of the Willamette meridian for irrigation and domestic use thereon," and "a right of way for said pipe line across the north half (N ½) of the southwest quarter (SW ¼) and the southeast quarter (SE ¼) of the southwest quarter (SW ¼) of section 12".

In 1932 or 1933 the defendant filed a homestead entry on Lots 1, 2 and 3, comprising approximately 27 acres, in section 14, township 38 south, range 7 west, W. M. These lots are immediately south of and adjoining section 11. The defendant's house is located on Lot 2, about one-fourth mile south and one-half mile west of the spring. Cedar creek, which flows in a southwesterly direction across defendant's Lot 1 east of his house supplies him with some water for irrigation purposes.

The plaintiff since 1909 has owned and lived on the northwest quarter of section 13, and also since that year has owned the southwest quarter of the southwest quarter of section 12, which latter tract is directly west of and adjoining the forty-acre tract on which the spring here involved is located. The plaintiff's house is approximately 400 feet west and 2,000 feet south of this spring.

The spring in question is on a mountain side between two parallel ridges extending in a southwesterly and

northeasterly direction. Between the ridges is a draw or, as some of the witnesses term it, a gulch, down which, during the season of heavy rains from January to June or July, a considerable body of water flows in a southwesterly direction into the Messinger irrigation ditch, which extends in a northwesterly direction across section 13.

On June 6, 1935, after he had obtained the above-mentioned deed from Josephine county, the defendant filed with the state engineer an application for a permit to appropriate the waters of the said spring and of Cedar creek, the water to be used for irrigation purposes on the land now owned by the defendant, which permit was granted by the state engineer July 10, 1935.

Thereafter, on November 22 of the same year, the plaintiff procured from Josephine county a deed for the north half of the southwest quarter and the southeast quarter of the southwest quarter of the above-mentioned section 12, which deed was made expressly subject to the rights theretofore granted to the defendant by the deed of June 4, 1935, from Josephine county to him.

On May 21, 1936, the defendant filed another application for a permit to appropriate water from the spring above referred to, for domestic purposes, which permit was granted by the state engineer on July 15 of the same year.

During the spring or summer of 1927, William Herman, who had been and apparently then was the owner of the southeast quarter of the southwest quarter of section 12, and the lands immediately north of that tract, was carrying on logging operations on those lands and was desirous of finding water for the horses used in his work. In looking over the ground he found no particular spring but did find some surface water

at the place where the spring now involved is located. With reference to such spring, he gave the following testimony:

"Q. * * * and did you have occasion at that time to become familiar with the location of that spring in question here? A. Well, yes and no. We never knew there was a spring there until we opened it up for water for logging in there. Q. That was the spring at the foot of these two old alders? A. Yes, sir.

"Q. There was no particular spring there until you opened it up for the use of your loggers? A. All that showed there was there was some water and this surface water went down through there, but we didn't see where any spring had been opened up.

\* \* \* \* \* \* \*

"Q. You mean there wasn't any run-off? A. There was a little run-off on the top of the ground, but really there wasn't any water there for horses or any one and we dug a hole about the size of a wash-tub so we could have water for the logging horses."

It is not disputed that the place where the witness dug the hole is the location of the spring now in controversy. The spring as at present existing is approximately 250 feet south and 60 feet east of the northwest corner of the southeast quarter of the southwest quarter of section 12 above mentioned. It is therefore 60 feet east of the east line of the southwest quarter of the southwest quarter of section 12, which land has been owned by the plaintiff since 1909.

The plaintiff contends that prior to the logging operations carried on by Herman in 1927 there was a spring on her land in the southwest quarter of the southwest quarter of section 12, some 150 to 200 feet west and south of the present spring; that the water from such spring during a part of the year flowed in a well-defined channel with definitely marked banks, in a

southwesterly direction across the said southwest quarter of the southwest quarter of section 12 and into her irrigation ditch, some 700 or 800 feet south of the south boundary line of her above mentioned forty-acre tract; that during the season of the year when the water was flowing it was used for livestock; and that she had acquired a riparian right to the use of the said water for livestock and domestic purposes. She further contends that the logging operations conducted on the land and the excavation of the present spring by Herman had diverted to a new outlet the water which had formerly supplied her spring.

After the execution of the deed from Josephine county to the defendant, in which reference is made to the spring and the right of way for a pipe line and ditch, and after the first application had been filed by the defendant for a permit to appropriate the waters of the spring and of Cedar creek, the plaintiff installed a pipe line from the present spring to her house in section 13 and diverted water from the spring for domestic purposes. This action by the plaintiff and the attempt of the defendant to prevent her from using the pipe line resulted in the present litigation.

Mrs. Ella Haviland, who was 77 years of age at the time of the trial, testified that she had lived in what is now known as the Messinger house from 1875 to 1881, and that during the time she lived there water was brought to the house from a spring which she thought was on the northwest quarter of the southwest quarter of section 12. She further testified that she had not been at the spring since 1881, when she left that vicinity, and she had no personal knowledge whether or not the spring was in the same place as admitted to be at the present time.

The plaintiff, Mrs. Messinger, stated that in the spring of the year considerable water flowed in a well-defined channel from the spring, which she claims was at one time located on the southwest quarter of the southwest quarter of section 12; and that there was a large hole dug at what she referred to as the main spring, out of which cattle drank water. There were smaller springs near by, she said. Mrs. Messinger further testified that the old spring was some 150 to 200 feet south of the present location, and she did not know of the change of location until 1935, which was eight years after Mr. Herman dug a hole at the present admitted site of the spring. The plaintiff used water for household purposes from a well near her home until 1935, when the water in the well seemed to become impure or contaminated, whereupon she attempted to pipe water from the spring to her home.

Mr. C. A. Moore, who had been in the vicinity of the spring at intervals for many years, testified that the water from the spring flowed in a natural channel. His further testimony in this connection was as follows:

"Q. Well, by 'natural channel,' as I understand your testimony, you merely refer to this natural draw there, the natural drainage off through there from the spring? A. Yes.

"Q. You say the water ran down to the Messinger ditch? A. When it rained pretty hard. Q. Perhaps during the winter it would sometime do that? A. Yes.

\*     \*     \*     \*     \*

"Q. As a matter of fact, during the greater part of the year, the running water from the spring disappeared about two or three hundred feet below the spring—just seeped into the ground? A. It did in the dry season.

\*     \*     \*     \*     \*

"Q. How about the wet season? A. Then there was lots of water.

*     *     *     *     *

"Q. You say you used the water for the stock. I suppose you put in some sort of a trough or something like that—they did some work there? A. We dug a little ditch running to the field, was all.

*     *     *     *     *

"Q. The stock drank water from the spring, didn't it? A. Most of it."

In the fall of 1928 or 1929 Herman Schmidt dug a hole on the plaintiff's forty-acre tract east of the spring in question, where there appeared to be a spring or seepage, for the purpose of collecting water for stock. According to the testimony of Harold Messinger, son of the plaintiff, the water from the spring would gather in small pools, from which livestock would drink. He stated that there was no flow of water from the spring during the summer months, and that, "It usually don't start until after the first of the year, depending on the amount of rain; whenever it rains hard, then it flows— rains hard." Frank Sargent testified that the water around the springs "seeps out over the ground" and that "it kind of spreads out from the spring down". Asked whether the water spread over the hillside after leaving the spring, this witness answered: "Naturally, when they dug the hole, there was a spring, and they dug the hole out and after it left there, why, it spread out. *  *  * In other words, it run over that soil; there was a kind of swag there and it drained down that swag. That is as near as I could tell you."

All the foregoing witnesses except William Herman were called by the plaintiff. None of them seemed to be able to locate definitely the spring which is claimed to

have been originally on the plaintiff's forty-acre tract. It does not appear that they knew the boundary line between that land and the tract on which the spring in controversy is located. From the testimony of these witnesses it is apparent that during the rainy season there was a considerable flow of water from the hillside down the draw and into the Messinger irrigation ditch. There were numerous wet places on the hillside where water could be collected in some quantity by digging holes or basins.

From the testimony of numerous witnesses called by the defendant it appears that there is not now and has not been for some years any spring on either the southwest or the southeast quarter of the southwest quarter of section 12 from which water flows in a well-defined natural channel. There is now and for some time past has been more or less seepage water in the vicinity of the spring in controversy and near the place claimed to be the site of the original spring; and during the wet season water runs off down the hillside and into the draw hereinbefore described.

From all the evidence in the record it is manifest that at no time did the water flow from the spring here in controversy in sufficient volume to constitute a water course. No natural channel was defined by the flow or drainage from the spring. The channel which is asserted to have been formed in the gulch by the flowing of water was apparently caused principally by drainage from the hills during the rainy season of the year, and not by the flow from any particular spring.

Section 47-1401, Oregon Code 1930, reads as follows:

"All ditches now constructed, or hereafter to be constructed, for the purpose of utilizing the waste, spring, or seepage waters of the state, shall be governed by the same laws relating to priority of right as those

ditches constructed for the purpose of utilizing the waters of running streams; provided, that the person upon whose lands the seepage or spring waters first arise, shall have the right to the use of such waters."

The spring water here involved first arises, as far as the record before us discloses, on the southeast quarter of the southwest quarter of section 12. Thence it may through seepage reach the southwest quarter of the southwest quarter of that section, but it does not flow from the southeast quarter of the southwest quarter through a defined channel to that tract.

This court in *Klamath Development Company v. Lewis*, 136 Or. 445 (299 P. 705), said:

"Practically all of the testimony is to the effect that prior to on or about February 20, 1925, when the waters thereof were first diverted by artificial means under an express agreement with plaintiff, the spring in question at all times was upon plaintiff's property and by reason of seepage or evaporation did not flow in any channel or to or upon adjacent property. Such a spring is not subject to appropriation by a person other than the owner of the land: § 47-1401, Oregon Code 1930; Morrison v. Officer, 48 Or. 569 (87 P. 896); 2 Kinney on Irrigation and Water Rights, § 648, p. 1135, note 9."

See, also, *Henrici v. Paulson*, 134 Or. 222 (293 P. 424).

Under the facts in this case, the defendant is entitled to the use of the water from the spring here in controversy. It is not here necessary to pass upon the effect of the permits issued by the state engineer to the defendant to appropriate water from the spring for irrigation and domestic purposes, for the reason that Josephine county, the owner of the southeast quarter of the southwest quarter of section 12, on which the spring is located, granted to the defendant the right to use said

water and to convey it from the spring to his premises; and for the further reason that the plaintiff has not shown any right in herself to the use of this water.

We are of the opinion that the trial court committed no error, and the decree appealed from is therefore affirmed.

LUSK and RAND, JJ., not participating.