Argued July 8, affirmed September 23, 1959
# FITZSTEPHENS *v.* WATSON ET AL
344 P. 2d 221

*J. B. Bedingfield*, Coos Bay, argued the cause for

appellants. With him on the brief was Herbert R. Dewart, Gold Beach.

*Frederic H. Starkweather, Jr.,* Gold Beach, argued the cause and submitted a brief for respondent and cross-appellant.

Before McALLISTER, Chief Justice, and PERRY, O'CONNELL and CRAWFORD, Justices.

O'CONNELL, J.

This is an appeal by the defendants from a decree permanently enjoining the defendants from interfering with the flow of water in a pipeline running from a reservoir on defendants' land to the land of the plaintiff. The decree also enjoined the defendants from violating the terms of an "Easement Deed" in which the defendants covenanted to maintain the water system through which the water was conveyed to the grantee's land. The plaintiff's prayer for damages resulting from the alleged conduct of the defendants in cutting off plaintiff's water supply was denied.

We shall refer to the defendants' and the plaintiff's lands as the servient and dominant tracts respectively. Both of these tracts originally constituted one large parcel known as the "Davies Ranch." Various seeps and springs rise on the servient tract now owned by the defendants. The water from these sources forms a small creek with well defined banks which runs south-westerly a distance of approximately 1800 feet where it empties into the Rogue River. The creek never wholly leaves the tract referred to as the "Davies Ranch" although for a few feet just north of the river a part of the creek flows over the land of an adjoining owner, the center of the creek marking the boundary between the contiguous parcels.

While Davies was still the owner of the entire tract known as the Davies Ranch he installed a water system to make use of the spring water on his land. He placed a pipe in the creek bed near the springs from which the water was permitted to flow by gravity to a large redwood storage tank. The intake pipe leading to the tank was originally either three-fourths or one inch in diameter, the evidence on this point being in dispute. A two-inch pipe conveyed the water from the reservoir for use on the ranch.

On November 20, 1956 Davies and his wife conveyed the dominant tract, consisting of approximately three acres, to Robert W. Mairs and Harriet B. Mairs. This tract was bounded on the west by the creek described above. According to the plaintiff's testimony a part of the consideration for the sale of the dominant parcel was an oral agreement between the parties by which the grantors promised to supply to the grantees water from the system on the grantor's land. Soon after the conveyance Mairs connected a two-inch pipe to the pipeline on the land retained by the grantors and used the water on the dominant tract. Thereafter, Davies and his wife executed and delivered to the Mairs an instrument entitled "Easement Deed" which was dated "—— January, 1947," acknowledged October 8, 1947 and recorded on October 25, 1947. The relevant parts of this instrument are as follows:

> "WHEREAS the grantors have agreed, * * * to furnished [sic] to the grantees water for use on the above described premises to the extent of three-eighths of the volume now presently flowing through the pipe line connecting a reservoir situated on the property of the grantors and running to the property above described owned by the grantees, and
>
> "WHEREAS the grantors further agree to

maintain an adequate reservoir and pipe line to furnish said water,

"NOW THIS INDENTURE WITNESSETH that the grantors hereby covenant that they, their heirs or assigns will maintain a reservoir on the property now known as the Davies Ranch and a pipe line leading from the said premises to the above described premises owned by the grantees and will furnish to the grantees, their heirs or assigns, water equal to three-eighths of the volume now flowing through the pipe line presently carrying water from the Davies Ranch premises to the above described premises owned by the grantees."

On November 4, 1947 Davies and his wife conveyed the servient tract to the defendants L. W. Watson and Anna May Watson and two other grantees whose interest the Watsons later acquired. The deed effecting this conveyance contained the following exception:

"Also excepting a certain water right appertaining to a portion of said excepted Tract 1."

A portion of Tract 1 constituted a part of the dominant tract.

The Mairs developed a part of the dominant tract as a fishing resort which was serviced by water from the pipeline. On April 27, 1948 they sold the eastern two-thirds of the dominant tract, including the resort buildings, to the plaintiff and his wife. No mention was made in the deed of the water right described in the "Easement Deed." Upon the death of his wife the plaintiff became the sole owner of this parcel. The plaintiff made improvements on his tract, including the construction of additional cabins, a trailer camp and laundry facilities, all of which used water from the pipe line.

The remaining one-third of the dominant tract was

conveyed on August 25, 1950 by the Mairs to Edgar B. Spear and wife, the deed including a grant of "all water right pertaining" to the land conveyed.

The defendants likewise have developed the servient tract as a fishing resort which is in competition with the plaintiff's business. The defendant Inell Bobo is the daughter of the Watsons. She and her husband, the defendant R. B. Bobo, live on the servient tract. The water from the system was used on dominant and servient tracts by the various owners without a water permit from the State Engineer until June 17, 1949 when the Watsons obtained a permit, followed by a "Certificate of Water Right" dated July 6, 1954.

On numerous occasions from 1949 until this suit was filed the plaintiff's water supply was interrupted for periods ranging from five minutes to five hours. The interruptions resulted from the defendants' conduct in closing a valve in the pipe leading to the plaintiff's land. The plaintiff's pipe line ran downhill and the defendants' slightly uphill, as a consequence of which the defendants were the first to suffer in the event of a water shortage. The defendants contend that the water was shut off on the occasions referred to in order to obtain a flow of water in the pipe line leading to their buildings when the water supply was short. It was also contended by the defendants that the shortage of water in the system was due in part to the plaintiff's wastful use of the water. The plaintiff accuses the defendants of cutting off the water supply for the purpose of harassing the plaintiff and interfering with his resort business.

In 1950, shortly after the interruptions in his water supply had begun the plaintiff obtained a revocable license to draw water from a spring on the property of

a landowner on the opposite side of the Rogue River. The water was pumped across the river through plastic pipe which had to be removed from time to time to prevent its being swept away by the destructive force of the river current. The plaintiff has included the cost of installing and operating this system as a part of the damage alleged to be attributable to defendants' unlawful conduct in cutting off the plaintiff's water supply.

The controversy between the parties was finally brought to a head by a letter written on October 9, 1954 by the defendants' attorney informing the plaintiff that the defendants would need all of the water during the following spring season and that the plaintiff would not be permitted to use any water from the system from that time forward. On February 15, 1955 the plaintiff filed the present suit. The trial court held that the "Easement Deed" referred to above created "a valid and perpetual easement and is binding and effective as to all its terms and covenants therein contained"; that the rights and duties thus created ran with the land both as to benefit and burden; and that the defendants were permanently enjoined from interfering with the plaintiff's use of the water and from violating the covenants in the deed. As we have already stated, the trial court rejected plaintiff's claim for damages.

■ The water which is the subject of dispute has its surface source in two springs which arise on the defendants' land. The plaintiff asserts that the point of diversion for the water system is directly from the springs at the point where they issue from the ground. The defendants assert that the water is diverted from the bed of a small creek formed by the springs. The

plaintiff admits that the waters leaving the springs follow a defined channel over defendants' land and eventually empty into the Rogue River. It is shown that the water never completely leaves the defendants' land although it touches neighboring land for a short distance before it reaches the river. The evidence clearly establishes the fact that water flows all year 'round between well defined banks through most of its course. Although it runs only a short distance from its source to the river we are satisfied from the testimony that the water flows in a watercourse. *Levene v. City of Salem*, 191 Or 182, 229 P2d 255 (1951); *Hansen v. Crouch*, 98 Or 141, 193 P 454 (1920); *Simmons v. Winters*, 21 Or 35, 27 P 7, 28 Am St Rep 727 (1891); *Shively v. Hume*, 10 Or 76 (1881).

It is the plaintiff's position that the spring waters in question were a part of the land and that an easement entitling the grantee to the use of a part of the water could be created. In support of this position plaintiff relies upon ORS 537.800 which reads as follows:

"All ditches now or hereafter constructed, for the purpose of utilizing waste, spring, or seepage waters, shall be governed by the same laws relating to priority of right as those ditches constructed for the purpose of utilizing the waters of running streams; provided, that the person upon whose lands the seepage or spring waters first arise, shall have the right to the use of such waters."

■■ Where spring waters arising on an owner's land do not flow from the spring in such a manner as to constitute a watercourse it has been held that the owner is entitled to the exclusive use of such waters as against competing claimants. *Beisell v. Wood*, 182 Or 66, 185 P2d 570 (1947); *Messinger v. Woodcock*, 159

Or 435, 80 P2d 895 (1938); *Klamath Development Co. v. Lewis,* 136 Or 445, 299 P 705 (1931); *Henrici v. Paulson,* 134 Or 223, 293 P 424 (1930); *Morrison v. Officer,* 48 Or 569, 87 P 896 (1906).

Where, however, the waters leaving the spring form a watercourse and flow to the land of another the waters in the watercourse are subject to the law applicable to the appropriation of stream waters and the circumstance that the stream originated on an owner's land does not give him any preference to the water over other persons. *Hildebrandt v. Montgomery,* 113 Or 687, 234 P 267 (1925). Logically the same rule is applicable if the waters forming a watercourse do not leave the owner's land before emptying into another watercourse as was the situation in the present case. Cf. *Dry Gulch Ditch Co. v. Hutton,* 170 Or 656, 133 P2d 601; cf. 1 Wiel, Water Rights in the Western States (3d ed) § 337 p 358; Hutchins, Selected Problems in the Law of Water Rights in the West (1942), Ch. 5, p 266, et seq.

It follows that the waters in question were subject to appropriation under the provisions of ORS 537.010 et seq. The defendants having obtained an official certificate of water right pursuant to these provisions contend that they have the prior right to use the water as against the plaintiff who has no official water permit from the State Engineer. The defendants attack the plaintiff's asserted right to take the water on several grounds; (1) that ORS 537.130, which provides in part that "No person shall use, store or divert any waters until after the issuance of a permit to appropriate such waters" makes unlawful plaintiff's use of the water; (2) that the water was public water subject to appropriation under the water code and, therefore, it could not be distributed, sold or controlled by con-

tract; (3) that the Davies had no property right of any kind in such waters which could be the subject matter of the creation of an easement or covenant capable of running with the land, and (4) that even though the interest dealt with was a property interest the burden of the covenant would not run with the land to bind the defendants because there was no privity of estate between the covenantor and the covenantee.

■ The central idea in the defendants' argument is that our water code is the sole source of rights to the waters of a stream. It must be admitted that although we have a dual system of water rights embracing both the riparian and prior appropriation doctrines, very little vestige of the riparian doctrine remains in this state insofar as it may be asserted against those who base their claim to the use of water on the priority of appropriation under the water code. See Hutchins, The Common-Law Riparian Doctrine in Oregon: Legislative and Judicial Modification, 36 Or L Rev 193 (1957). Occasionally, however, riparian rights are still recognized in the adjudication of water rights in Oregon. See Ibid. at 218; *Hedges v. Riddle,* 63 Or 257, 127 P 548 (1912); *Hough v. Porter,* 51 Or 318, 95 P 732, 98 P 1083, 102 P 728 (1908); 1 Wiel, Water Rights in the Western States (3d ed), p 397-8.

■ It is commonly said that the two doctrines are entirely incompatible and that the statutory system of appropriation, if applicable, abrogates the riparian doctrine. *California-Oregon Power Co. v. Beaver Portland Cement Co.,* 295 US 142, 160, 79 L Ed 1356, 1362, 55 SCt 725, 730 (1935); *In re Sucker Creek,* 83 Or 228, 234, 163 P430, 433 (1917); *Brown v. Baker,* 39 Or 66, 70, 65 P 799, 801, 66 P 193 (1901); *North Powder Milling Co. v. Coughanour,* 34 Or 9, 22, 54 P 223, 227

(1898); cf., *In re Hood River,* 114 Or 112, 179, 227 P 1065, 1086 (1924), error dismissed *Pacific Power & Light Co. v. Bayer,* 273 US 647, 71 L Ed 821, 47 SCt 245 (1924); *In re Willow Creek,* 74 Or 593, 626, 144 P 505, 517, 146 P 475 (1914); *Williams v. Altnow,* 51 Or 275, 300, 95 P 200, 209, 97 P 539 (1908); *Davis v. Chamberlain,* 51 Or 304, 311, 98 P 154, 156 (1908). But this means only that if the water code is controlling in the particular circumstances the interest of one who obtains a permit to use water under the code is superior to that of a claimant asserting a riparian right to that water.

■■ It could not be contended seriously that the system of prior appropriation abrogates those interests of the riparian owner which do not conflict with an appropriator's claim; for example the right of access, *McCarthy v. Coos Head Timber Co.,* 208 Or 371, 302 P2d 238 (1956); *Darling v. Christensen,* 166 Or 17, 109 P2d 585 (1941); *Hanson v. Thornton,* 91 Or 585, 179 P 494 (1919); or the right to accretions, *Kingsley v. Jacobs,* 174 Or 514, 149 P2d 950 (1944); *Wyckoff v. Mayfield,* 130 Or 687, 280 P 340 (1929); *Armstrong v. Pincus,* 81 Or 156, 158 P 662 (1916); or other rights relating to the water which flows over his land. See *Eastern Oregon Land Co. v. Willow River Land & Irrigation Co.,* 201 F 203 (9th Cir 1912); American Law of Property, § 28.55; note 27 Wash L Rev 79 (1952). And where the right to abstract water from a stream is at issue there are circumstances under which the water code would not be applicable and the riparian doctrine would be operative. See 1 Wiel, Water Rights in the Western States (3d ed), p 396. Thus, if neither claimant rests his claim on an appropriation made pursuant to the water code their rights must be correlated by the application of principles which exist outside of

the code. Those principles are found in the law of riparian ownership. This is essentially the view taken in both the majority and dissenting opinion in *State v. Red River Valley Co.*, 51 N M 207, 182 P2d 421 (1945). The language of Justice Bickley, dissenting, is particularly apposite. He said that "before an appropriation has been made * * * the common law is the only law that can apply. When the appropriation is made the law of appropriation steps in to the extent and only to the extent necessary to make the appropriation fully effective." 182 P2d at p 443. And again at page 445:

"My argument is that whatever its origin, the appropriation doctrine has been superimposed upon an underlying riparian doctrine and that the basic riparian doctrine has been modified to the extent and only to the extent which is necessary to give full force, application and effect to this superimposed appropriation doctrine." *State v. Red River Valley Co.*, 51 N M 207, 182 P2d 421.

In *Hutchinson v. Watson Slough Ditch Co.*, 16 Idaho 484, 101 P 1059 (1909) at page 1061, 1062 and 1063, the court, referring to an earlier Idaho case, said:

"* * * that case seems to have been very careful not to hold that a riparian proprietor had no rights, as such, at all, but rather that his rights as a riparian proprietor, whatever they might be, were inferior to the rights of an appropriator of the waters. * * *

"A riparian proprietor in the state of Idaho has no right in or claim to the waters of a stream flowing by or through his lands that he can successfully assert as being prior or superior to the rights and claims of one who has appropriated or diverted the water of the stream and is applying it to a beneficial use. To this extent, therefore, the common-law doctrine of riparian rights is in conflict with

the Constitution and statutes of this state and has been abrogated thereby.

\* \* \* \* \*

"\* \* \* Is there anything in the Constitution of this state contrary or repugnant to the assertion by respondent of his riparian rights as against one who attempts to shut off the source of supply of the stream, and who does not found his right to do so upon his appropriation of such waters to a beneficial use? \* \* \*

"As we have before seen, the common-law doctrine of riparian proprietorship, whenever it comes in conflict with a water right acquired by appropriation, is at once in conflict with and repugnant to both the Constitution and statutes of this state. We are unable to find, however, any particular wherein it would be repugnant to any provision either of the organic or statutory law of the state where it does not come in conflict with a right acquired by appropriation in conformity with law. \* \* \*

\* \* \* \* \*

"\* \* \* But a riparian owner still retains such right to have the waters flow in the natural stream through or by his premises as he may protect in the courts as against persons interfering with the natural flow, or who attempt to divert or cut off the same wrongfully and arbitrarily, and without doing so under any right of location, appropriation, diversion, or use, and who do not rest their right to do so upon any right of use or appropriation. \* \* \* The riparian owner's right to use the water for domestic and culinary purposes and watering his stock, and to have the water flow by or through his premises, is such a right as the law recognizes as inferior to a right acquired by appropriation, but superior to any right of a stranger, intermeddler, or interloper."

See also Note, Riparian Rights in Appropriation

States, 9 Wyo L J 130 (1954); *But see* Wiel, Unregistered Water Appropriations at Law and In Equity, 14 Calif L Rev 427 (1926). Our own water code has been described as a "modification" only of the law of riparian ownership. *California-Oregon Power Co. v. Beaver Portland Cement Co.,* 73 F2d 555 (9th Cir 1934). We regard this as the more accurate way of viewing the effect of our statutory law adopting the prior appropriation system upon the law of riparian rights.

■ We can say, then, that when Davies and his wife were owners of the land now held by the defendants, a part of that ownership consisted of the riparian right to use the waters in the watercourse on their land to the extent that it did not conflict with superior rights derived through the water code. That interest was transferable to the Mairs.

■ Although there is a conflict of authority as to whether the grant to a non-riparian owner of the riparian owner's rights is effective as against other riparian owners, 6-A American Law of Property, § 28.55; Burby on Real Property (2d ed) p 61; 5 Powell, Real Property, §§ 711, 712, 714; Restatement of Torts, Explanatory Notes to Tentative Draft, § 1318; 1 Wiel on Water Rights in the Western States (3d ed) § 847; 4 Colum L Rev 431 (1904); 26 Harv L Rev 661 (1913), it is clear that as between the parties to the conveyance the grantor is bound by his grant. *Rank v. (Krug) United States,* 142 F Supp 1, (D C Calif 1956) and cases cited therein. Cf. *Kennebunk, Kennebunkport and Wells Water Dist. v. Maine Turnpike Authority,* 147 Me 149, 84 A2d 433 (1951); *Campbell v. Nunn,* 78 Utah 316, 2 P2d 899 (1931).

It is held that the effect of such a grant is an estoppel against the grantor. This is the reasoning found

in *Duckworth v. Watsonville Water & Light Co.*, 158 Cal 206, 110 P 927 (1910). In that case it was held that where the owner of land conveyed his riparian rights and later conveyed land to a third person who thereupon purported to make an appropriation under the California Water Code, the subsequent grantee took subject to the rights of the first grantee. Speaking of the conveyance of the riparian rights the court said:

> "* * * That grant was, of course, not effective to convey any right not owned by the grantor or owned by third parties. It was, however, effective as an estoppel on the grantor and her successors, preventing them from objecting to any use by the water company of water which might, in the absence of the deed, have been applied for the benefit of the McKinley land." 110 P at p 930.

Referring to the subsequent grantee's claim, the court said:

> "* * * The right which he claims is the right to take water and use it upon his land. That right has been conveyed to the defendant, and the plaintiff cannot, in the face of his predecessor's deed, be permitted to revive it, or retake it by the mere device of entitling his taking an 'appropriation.'" Supra at p. 931.

The theory by which the grant of riparian rights operates is also stated in *California, etc., Co. v. Madera Irr. Co.*, 167 Cal 86, 138 P 718 (1914), as follows:

> "The effect of such a grant is simply to convey the grantor's right to the use of the water on his own riparian land, and to estop the grantor to complain against any use of the water which the grantee may make to the injury of such riparian right. * * * Such estoppel is effective as to the whole riparian right of the grantor simply because of the terms of his purported grant thereof. By reason of his voluntary act he has waived for himself and his

successors all claims based on the doctrine of riparian rights, and is in no position to complain of any invasion thereof by the grantee or his successors." 138 P at p. 721.

See also *Spring Valley Water Co. v. Alameda County,* 88 Cal App 157, 263 P 318 (1927); note, 35 Calif L Rev 603 (1947).

■ Our cases recognize that riparian rights may be conveyed to a non-riparian owner. *Coquille Mill & Mercantile Co. v. Johnson,* 52 Or 547, 98 P 132 (1908); *Morton v. Oregon Short Line Ry. Co.,* 48 Or 444, 87 P 151, 87 P 1046, 7 LRA (NS) 344, 120 Am St Rep 827 (1906); *Montgomery v. Shaver,* 40 Or 244, 66 P 923 (1901); *Curtis v. La Grande Water Co.,* 20 Or 34, 23 P 808, 25 P 378, 10 LRA 484 (1890); cf., *Norwood v. Eastern Oregon Land Co.,* 112 Or 106, 227 P 1111 (1924).

■ We hold that Davies and his wife were the owners of a riparian right to take the water from the stream on their land except as their abstraction of the water would impinge upon the superior rights of others; that this riparian right was transferable and that it was transferred to Mairs and his wife, the plaintiff's predecessors in interest; that the effect of the transfer of this right was to create an easement in the land of the Davies; and that the defendants took that land burdened with the easement.

■ The interest which the plaintiff acquired was an easement. *Wright v. Best,* 19 Cal2d 368, 121 P2d 702 (1924). The instrument by which the transfer of Davies' riparian rights was effected was entitled "Easement Deed." However, it is cast in the language of covenant as well as grant. Its title indicates that the draftsman regarded the transaction as convey-

ancesory rather than contractual. So also with the reference to the parties as "grantors" and "grantees." On the other hand, the instrument recites that the parties "agree" and "covenant" to supply a certain volume of water and to perform other acts necessary to provide the grantees with water from the grantors' premises. The instrument recites that "the grantors *have* agreed" to furnish water to the grantees, undoubtedly referring to the oral arrangement for water previously entered into between them contemporaneous with the conveyance of the land. The fact that the instrument was intended to memorialize what the parties regarded as an earlier executed transfer of water rights may have influenced the use of language describing what the parties had already settled or "agreed upon" as a part of the previous conveyance of the land. As pointed out in Conard, Words Which Will Create an Easement, 6 Mo L Rev 245, 254 (1941):

> "* * * We can, and sometimes do, *grant* an affirmative easement, but it is also possible to think of its creation as an undertaking by one's neighbor that he will allow the use of his land and that he will refrain from obstructing such use. In fact, the cases disclose that many laymen and many lawyers thoughtlessly employ words of promise rather than words of grant when they want to set up easement relationships."

Further, it is obvious that the parties were attempting to create in the Mairs two interests; viz., (1) the privilege of using water, an interest ordinarily created as an easement, and (2) the right to require the "grantors" and their successors to maintain the water system including the reservoir and pipe line, a type of interest which usually arises by way of covenant. Although the "Easement Deed" in the present case is not artfully drawn it may be regarded as creating these

two forms of interest, granting to the Mairs an easement entitling them to the use of water from the Davies land and at the same time creating in them a contract right to have the water supplied and the water system maintained. A similar construction was given to the instrument involved in *Murphy v. Kerr*, 5 F2d 908 (8th Cir 1925), 41 ALR 1359 where the facts were similar to those in the instant case. The court said:

"* * * A thoughtful consideration of these terms of the covenant leaves no doubt that Mrs. Tansill intended that this covenant to pump the water should run with the land, and should vest in the defendant an easement and water right in the 11 acres, the dam, power plant, and appurtenances, while owned by her assigns, to have the water pumped into the reservoir of the defendant on tract A in accordance with the provisions of the agreement." 5 F2d at p. 910.

After setting forth the essential elements of an easement the court continued, as follows:

"* * * A thoughtful comparison of these essential qualities of an easement with the water right of the defendant to the pumping of the water to her reservoir based on the covenant in Mrs. Tansill's deed to the defendant demonstrates the fact that it possesses every one of these qualities, and the rational and logical result is that there was no error of law or mistake of fact in the decision and decree of the court below that the defendant had a water right and easement in the 11 acres, dam, and power plant of the Carlsbad Company for the pumping of water from the Pecos river into her reservoir in accordance with the terms of the covenant in Mrs. Tansill's deed to her." 5 F2d at p. 911.

The fact that the Easement Deed in the present case expressed the rights and duties of the parties in contractual terms does not preclude the construction that ·an easement was created. As Justice Holmes stated in

*Hogan v. Barry,* 143 Mass 538, 10 NE 253 (1887), "There is no doubt that an easement may be created by words sounding in covenant." *Bronson v. Coffin,* 108 Mass 175 (1871) is to the same effect. This principle is recognized in *Beck v. Lane County,* 141 Or 580, 590, 18 P2d 594 (1933) where it is said:

> "Where the owner of land enters into a covenant concerning the land or its use, and thereby subjects it to an easement, the covenant is construed the same as an express grant and by the same rules of carrying out the intention of the parties; or, as otherwise expressed, words sounding in covenant only, may operate by way of grant of an easement, wherever it is necessary to give them that effect in order to carry out the manifest intention of the parties. 9 R.C.L., 749, § 18; *Hotchkiss v. Young,* 42 Or. 446, (71 P. 324)."

Where the instrument describes the type of right in the promisor's land which has been recognized traditionally by the courts as an easement (such as the right to a supply of water from the promisor's land) words of covenant describing such rights have been construed as words of grant. 2 American Law of Property, § 9.12, p 372; note 29 N. C. L Rev 455 (1951). In the instant case the "grantors" agreed "to furnish to the grantees, their heirs or assigns, water equal to three-eighths of the volume now flowing through the pipe line presently carrying water from the Davies Ranch premises to the above described premises owned by the grantees." We construe this language as creating an easement appurtenant to the land of Mairs, a part of which is now owned by the plaintiff. In addition to this easement, the instrument also created a covenant on the part of the grantors to maintain a reservoir and pipe line on their premises for the purpose of furnishing such water. The conclusion we have reached is supported

by the better reasoned cases. There is authority for the proposition that a "covenant" or an "agreement" to furnish water may be construed as an easement. *Murphy v. Kerr,* supra; *Porto v. Vosti,* 136 Cal App2d 395, 288 P2d 618 (1955); *Lanthier v. Wharton,* 4 Cal2d 354, 49 P2d 278 (1935); *Stanislaus Water Co. v. Bachman,* 152 Cal 716, 93 P 858, 15 LRA (NS) 359 (1908), see annotation 127 ALR 835; *Horn v. Miller,* 136 Pa 640, 20 A 706, 9 LRA 810 (1890); *Ball v. Rio Grande Canal Co.,* 256 SW 678 (Tex Civ App 1923); *Cortella v. Salt Lake City,* 93 Utah 236, 72 P2d 630 (1937). Cases to the contrary may be found in 3 Powell on Real Property, § 407, p 401.

The right to use water from a spring or stream on another person's land has been recognized as an easement in many adjudicated cases. *Beisell v. Wood,* 182 Or 66, 185 P2d 570 (1947); *Patterson v. Chambers Power Co.,* 81 Or 328, 159 P 568 (1916); *Ruhnke v. Aubert,* 58 Or 6, 113 P 38 (1911); Annotation, 127 ALR 835. We think that the parties to the "Easement Deed" intended to create such an interest. The designation of the interest as an easement and the reference to the parties as "grantors" and "grantees" lends support to this interpretation. The instrument purports to bind not only the grantors but their "heirs or assigns" and to inure to the grantees and their "heirs or assigns." This further evidences an intent to create an interest, whether as an easement or covenant, which would be more than a personal contract between the parties to the instrument. Considering the other language in the instrument and the circumstances attending its execution we are of the opinion that the reference to the "heirs or assigns" of the grantors and grantees, respectively, indicates an intent to create a perpetual easement.

 The conclusion that an easement was created dispenses with the defendants' argument that the agreement did not bind the defendants because there was no privity of estate between the parties to the instrument. Privity is not necessary in the creation of an easement (although it may in fact arise through a succession of interests from grantor to grantee). Even though the "Easement Deed" were regarded as creating only a covenant to furnish water and no privity of estate existed between the covenanting parties, the burden and benefit of the covenant would pass with the land to the successors of the covenantors and the covenantees, respectively, in equity. Although the prevailing view is that privity of estate between the covenantor and covenantee is necessary for a covenant to run at law, such privity is not necessary to create an enforceable equitable servitude against a subsequent purchaser of the servient estate if he has notice of the covenant. 2 American Law of Property, § 926; 5 Powell on Real Property, p 161-2, 188; 5 Restatement, Property, Servitudes, § 539, Comment i; *But see Hall v. Risley and Heikkila,* 188 Or 69, 213 P2d 818 (1950).

 If the instrument in the present case is regarded as giving rise to a covenant only, it imposed upon the covenantor an obligation of the type which creates in the land a servitude enforceable in equity. *Murphy v. Kerr,* 5 F2d 908 (8th Cir 1925); *Chrisman v. Southern California Edison Co.,* 83 Cal App 249, 256 P 618 (1927); *Farmers' High Line Canal & Reservoir Co. v. New Hampshire Real Estate Co.,* 40 Colo 467, 92 P 290 (1907); *Atlanta, K. & N. Ry. Co. v. McKinney,* 124 Ga 929, 53 SE 701, 6 LRA (NS) 436, 110 Am St Rep 215 (1906); *Bolles v. Pecos Irrig. Co.,* 23 N M 32, 167 P 280 (1917); *Ball v. Rio Grande Canal Co.,* 256

SW 678 (Tex Civ App 1923) ; *Noonan v. Orton,* 27 Wis 300 (1870) ; notes, 18 Minn L Rev 598 (1934) and 15 Tex L Rev 278 (1937). The obligation may be regarded as imbedding itself in the soil of the covenantor imposing its burden upon successive possessors of the land if they have actual or constructive notice of the covenant. See 5 Restatement, Property, Servitudes, § 539.

█ Although there is authority for the proposition that affirmative covenants will not run with the land, *Merchants' Union Trust Co. v. New Philadelphia Graphite Co.,* 10 Del Ch 18, 83 A 520 (1912) ; *Kettle River R. Co. v. Eastern Ry. Co.,* 41 Minn 461, 43 NW 469 (1889) ; *De Gray v. Monmouth Beach Clubhouse Co.,* 50 N J Eq 329, 24 A 388 (1892) ; *Miller v. Clary,* 210 N Y 127, 103 NE 1114 (1913), *but see Neponsit Prop. Owners' Ass'n v. Emigrant Industrial Sav. Bank,* 278 N Y 248, 15 NE2d 793 (1938) ; *West v. Giesen,* 242 SW 312 (Tex Civ App 1922), the prevailing view is to the contrary. *Murphy v. Kerr,* supra; Annotation, "Affirmative Covenants as Running with the Land", 41 ALR 1363, supplemented 102 ALR 781, 118 ALR 982; see cases collected in Clark, Covenants and Interests Running With Land (2d ed) p 249 et seq. ; 5 Powell on Real Property, §§ 676, 677 ; 3 Tiffany, Real Property (3d ed) § 854; Bolles, Covenants of Estates in Land in Law and Equity, 33 Dick L Rev 50, 59 (1929) ; Lloyd, Enforcement of Affirmative Agreements Respecting the Use of Land, 14 Va L Rev 419 (1928) ; Walsh, Covenants Running with the Land, 21 N Y U L Q 28, 47 et seq. (1946) ; Note, 51 Harv L Rev 320 (1937). We accept the latter view. *Guild v. Wallis,* 130 Or 148, 279 P 546 (1929) ; see *Ford v. Oregon Electric Ry. Co.,* 60 Or 278, 117 P 809, 36 LRA (NS) 358 (1911).

█ The "Easement Deed" having been recorded

gave notice of plaintiff's interest to subsequent purchasers of the servient estate, including the defendants. In fact, the deed to the defendants Watson expressly excepted the interest created by the "Easement Deed." Even though the instrument had not been recorded the defendants would have had notice of plaintiff's interest from the presence of the pipe line running from the water source on defendants' land to the land of the plaintiff. *Zink v. Davis*, 203 Or 49, 277 P2d 1007 (1954) ; *Ford v. White*, 179 Or 490, 172 P2d 822 (1946) ; *McDougal v. Lame*, 39 Or 212, 64 P 864 (1901) ; *Low v. Schaffer*, 24 Or 239, 33 P 678 (1893); Annotation, "Physical Conditions Which will Charge Purchaser of Servient Estate with Notice of Easement" 41 ALR 1442 at 1445, supplemented 74 ALR 1250 at 1251. Having purchased the servient land subject to the easement and covenant the defendants could not vitiate those interests by obtaining a water permit from the State Engineer. *Duckworth v. Watsonville Water & Light Co.*, 158 Cal 206, 110 P 927 (1910).

The plaintiff has cross-appealed assigning as error the trial court's refusal to enter a decree awarding damages to the plaintiff which, it is alleged, resulted from the defendants' conduct in shutting off the plaintiff's water supply. Several of the guests at plaintiff's resort testified that on numerous occasions the water would not run from the taps in their cabins. The plaintiff contends that the water was cut off by the defendants as a part of a calculated plan to eventually take over completely the spring waters on their land and thus wholly deprive plaintiff of his water right. The defendants introduced evidence to explain the interruption of the flow of water. The defendant L. W. Watson testified that he turned off the valve controlling the flow to plaintiff's land when the reservoir

was empty during periods of dry weather. He asserted that the reservoir was emptied as a result of the extravagant use of water by the plaintiff and that it was necessary to cut off the flow to plaintiff's land in order to refill the tank. There was other testimony supporting this explanation. The reasonableness of this explanation has been attacked by the plaintiff. The evidence is in conflict, and we cannot find enough in the record to assure us that the plaintiff's version is more reasonable than the defendants'. Under the circumstances we are of the opinion that the trial judge properly rejected the plaintiff's claim for damages.

■ The plaintiff's easement is limited to three-eighths of the volume of water which was flowing through the pipe line from the reservoir to the grantee's land at the time the "Easement Deed" was delivered. Since the defendants took the position in their pleadings that the plantiff had no right to the water whatsoever, the evidence was not developed by either the plaintiff or the defendants to show that the plaintiff was entitled only to the specified quantity of water but that he took more than his share. Not having raised the issue, the defendants cannot now prevent the plaintiff from obtaining the relief which he prayed for in his complaint, namely, that the defendants be restrained from interfering with the plaintiff's rightful water supply. See *Dill v. Killip,* 174 Or 94, 147 P2d 896 (1944).

The decree of the lower court is affirmed.